The Honourable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honourable Court may give their attendance and they shall be heard. God save the United States of America and this Honourable Court. Court is in session. Today's case will be called as previously announced and the times to be heard today is Darry Mason Henderson versus the Massachusetts Bay Transportation Authority, Appeal Number 191720. Good morning to counsel and all. Attorney San Cristiano, please mute your radio. And Attorney Tweedy, please unmute your radio and proceed with your opening statement, which is two minutes' time allotted. Thank you, Your Honours. This is James Tweedy for Darry Mason Henderson, the plaintiff appellant in this matter. In order to survive summary judgment on a failure to promote claim, the plaintiff is required to show that he's a member of a protected class, that he's qualified for the position sought, that he was rejected for the position, and that someone outside the protected class who was not better qualified was hired. We respectfully suggest that we have done that. The defendant appellee has cited to several cases, in fact, four, in which they are alleging that the failure to score highly on a test is by itself sufficient to show that the plaintiff was not a qualified candidate for the position. Those cases are Gonzalez, Barnes, Martinez-Burgos, and Prescott. However, on each one of those cases, in addition to the low scores, the plaintiff cited to in order to buttress its decision that the plaintiff could not survive summary judgment. For example, in Barnes, the court noted that the plaintiff had failed to offset evidence submitted to show that the interviewer in the case had a history of promoting African-Americans and for encouraging African-Americans to apply for positions. That factor is not at all involved in this case. On Gonzalez, the record showed that Ms. Gonzalez did not have the requisite computer skills for the position that she was applying for, and she admitted so in a deposition. That is not the case in this situation. In Martinez, she had a history of problems in the workplace for which she had been sanctioned. Again, those factors are not anywhere present in this particular case. And in Prescott, we had a situation in which the person who was hired for the position had 10 years more experience than the other candidates, had more supervisory experience than the other candidates, and had more administrative experience than the other candidates. That's time, Judge. Thank you. Counsel, I'm sure you're familiar with the test that was given to your client. Yes. Is there anything in the test that you could claim would indicate inclination to engage in racial discrimination? What I can show, Your Honor, and one glaring factor in this, is that you had the candidate who was ultimately hired, Melacondia, who had a minimal amount of computer experience. Whereas Mr. Henderson had gone through several courses, had received several certificates while employed at the MBTA, on computer... Let me answer, but I take it your answer is no, that there's nothing in the test itself. I'm sorry, I misunderstood you. The test itself, in theory, there is nothing wrong. I think that there's a... Okay, now, okay. Excuse me, excuse me. I'd like to go to the second question. Is there any reason why the employee could not rely on the outcome of the test as the only standard to use in the hiring? Your Honor, I think there are reasons to question the process by which this came about. As we have said in our argument, the person who was ultimately hired for the test did not meet the minimal requirements that are listed in the job application, which is set out on RA-610-611. And that is what? RA-610-611. What is the requirement you're saying that was not met? There are minimal requirements that are set out in the job posting itself. And in order to secure an interview, you are supposed to have met those minimum requirements. Now, the defendant's appellee is saying, hey, they don't all apply. But if you look at the job posting itself, the job posting doesn't say that these don't apply. It is true that there are two that wouldn't apply. My question is, tell me which requirement was not met by the person that got the job. Well, first of all, Your Honor, he did not have any computer experience or had a minimal computer experience. And in addition, Your Honor, he left one entire section of his job application completely blank. And that is shown on page RA-772. There is a section there that says list your computer language or skills that are relevant to this position. That section is left completely blank. And interestingly, if you go to the end of that application, which is on RA-775, there is a section that says I fully understand and agree that any section left incomplete on this application, and then there are other factors involved, will be sufficient to cause for my application to be rejected. In other words, he did not fill a section out that was required. That section went directly to one of the MERS, that is, the minimal entrance requirements. He didn't sign his application. He didn't date his application. And nevertheless, he was granted a job. And he is a white candidate, and people knew he was white because he knew people at the MBTA. Now, I respectfully... Judge, that's time. Right, thank you. Judge Lynch? Okay, counsel. First, I want to admonish you about your application to be admitted for purposes of this case.  Getting to your case, what evidence do you have of differential application of the standards? The T has said that the decision as to who got an interview was made by HR screening the applications. That same procedure was used for all candidates. So that's the first question. The next question is about what I think is your mischaracterization of the qualifications of the candidate who got the job. He was asked at the interview about his computer skills, and he said he wasn't using them much at this time. He also said, I have used computer skills in scheduling and other construction-related activity. And he said, I use my home computer. So could you explain to me why a statement like that made to the interviewing people established to them that he did not meet the MERS? And what evidence is there that that evaluation on their part was racially motivated, other than the fact that the guy who got the job was white? That is not sufficient.  Your Honor, I want to at least minimally address the issue you raised at first. I was trying to put together the information. No, I want you to move on. Thank you, Your Honor. Your Honor, it seems to me that there are two things. The first is that the job application itself, the job posting itself, has specific requirements. It requires that you know Excel. It requires that you know Word. We're not talking about the posting. We are talking about the screening done for who gets the interviews and the MBTA's assertion that that screening was uniformly used for all candidates, white and black, for this position. What is your evidence that that is a false statement? Your Honor, if the only thing that the screening committee had when it was evaluating the applications for the interviews was the job applications themselves, in his job application, in his first unsigned, he has left a – I ask you what evidence you have of differential standards being applied. You are not answering my question. Sorry, Your Honor. Perhaps I don't understand the misunderstanding of the question. It seems to me that the issues being raised here have to do with how the selection committee chose the candidates to be interviewed. And in his case, our position is that there was no way they could have determined that he met the minimum applications because he left a portion of – But the point is that the T looked not only at the application form, but at the interview and what was said during the interview. And you have no evidence that the T differentially applied the standard that they would consider all of that information, correct? Your Honor, I'm sorry. They considered the interview as well as the application, correct? That is the position that they are taking now. All right, what evidence do you have that they treated candidates differently as to looking at both the application and at what was revealed during the interview? Your Honor, there's a two-step process in getting to the interview. The first is that the screening committee reviews the applications and makes a determination based on those applications as to who meets the minimal requirements in order to secure an interview. No, that is a false statement. That is not what this record says. And inherent in that statement is your assumption that the interview counted for nothing, that you could not get an interview unless all of the MERS requirements were set forth on the application form when the T says that was not the purpose of it all. What is your evidence of differential treatment? Your Honor, if the position is that a candidate could, through the interview process, clarify what his background was, that I would agree with. It's not a matter of what you agree with and don't agree with. It's a matter of differential treatment. What is your evidence of any differential treatment? Part of our evidence has to do with the fact that relative to the applications for an interview, Mr. M.D. conceded that internal candidates would have no way of knowing which MERS were required and which were not. That within internal candidates, within the internal candidate group, the internal candidates would only have been able to determine that all of the minimal requirements were met. He did testify that there was no communication with the internal candidates that certain of the MERS were not necessary in order to apply for the position. There is a differential there. Between internal candidates and external candidates. That's your thesis. That's the thesis, right? What evidence do you have that that's racially motivated? Your Honor, on its own, independent of the history of problems at the MBTA around the hiring and promotion of racial minorities, by itself I can agree with you. That is not enough. But there is a history there that includes problems relative to minority candidates. If you look at the... Counsel, thank you. This is in your brief. I'll turn it over to my colleague now. Judge Barron, do you have questions of Attorney Queen? Thank you. I wanted to start with one point about the record. Am I right that your client was a temporary change supervisor for a number of years? For five years, Your Honor. Is it the case that the person who was hired had never had that supervisory position at the T? That is correct. Okay. Then, with respect to this question of differential treatment, I'm understanding your argument to be, at least in part, focused on the blank, leaving the application blank with respect to one of the entrance requirements, and what I guess you take to be a significant one, which is the computer skills. And just so I understand the significance of that, is your suggestion that at least a jury could deduce from the fact that, although that significant entrance requirement was not evidenced on the application of the white candidate who was hired, but was evidenced on the black candidate who was not hired, that a jury could at least think that there was something suspicious about the process? Yes. That, Your Honor, and there's one other factor that I would raise, and that is that if you look at the interview scores, all of which are available in the record appendix, one of the oddities is that the individual who left that section blank and who testified that he had some computer experience, but not a great deal, scored higher on the question about his computer skills than our candidate who had a number of certificates from the MBTA relative to his computer training. And in addition, the record, I think, is clear that Mr. Henderson, in fact, had to assist and train the person who was ultimately hired on the computer skills necessary to do the job. I respectfully suggest that a reasonable fact finder could conclude that race had some effect on the decision of A, who got interviewed, and B, who got hired. Just on that point about the interview scores, my understanding is that on the computer question, although the candidate who had not filled out anything about the computer skills on the entrance requirement received almost a doubling of the score that your client's score was on computer skills. Now, one possibility is that that's a function of the answers that were given at the interview itself, which, after all, that's what's being evaluated. If we were to look at the record and to conclude that – I take it the district court concluded there was nothing from the notes of the interview that indicated that Mel Kandi's answer on computer skills was twice as good as your client's. Is that right? That is correct. I'm sorry, Your Honor. No, go ahead. Again, Your Honor, I think one of the factors that I think can't be ignored in this is the history of issues at the MBTA. I don't want to get into this. I want to focus just on the interview scores and the significance of it. So we have a district court concluding that at least as to one scoring of one question, which is a non-trivial question about computer skills, as I read the district court, she finds inexplicable the decision to give Mel Kandi such a significantly higher score on that answer than Henderson received. What is the significance of that to your case? I understand why it might be significant to the prima facie case. Is it also relevant to the pretext issue? I do think it is relevant to the pretext issue. The other fact is that, again – How is it relevant to the pretext issue? It is relevant because it is an indication that there is a bias that is present relative to minority candidates in their application. Even when they are trained and certified by the MBTA itself, the answers to the questions relative to those skills show up as approximately half of what another candidate provides in terms of answers who has not produced any certificates of training whatsoever and who has testified that his skills are relatively minor. I have one last question for you. The district court, as I read the opinion, agrees with you effectively with respect to the significance of that scoring of that question and what it shows about how much credit we can give to the scoring for the purpose of determining the prima facie case and who is qualified for the job and whether they are similarly qualified. With respect to pretext, the district court does not seem to return back to that scoring problem that she had earlier identified in her opinion. She then says, but there is no evidence of race discrimination. It may just be cronyism. Could you just respond to that? What should we do with the fact that the district court thought that since cronyism would be an alternative explanation, we cannot conclude that it was race discrimination? Your Honor, I'm going to ask you to bear with me for a second on this one. If what we're saying is that cronyism plays a role in the hiring process, in this particular hiring process or any hiring process, I respectfully suggest that the cronyism has to be raised blind. Because if it is not, given the history of hiring, not just at the MBTA, but throughout our society as a whole, it means that minority candidates are not going to have access to the same kinds of upper-level management people that many white candidates do. Cronyism by itself may, in fact, be nothing more than a smokescreen for race discrimination. If cronyism is applied so that more white males are hired for positions within the MBTA or any place else, that has a racial component to it, which affects negatively minority candidates at the MBTA and at other institutions within the society. It seems to me that if cronyism is an acceptable fact here, then the argument before a reasonable fact-finder could be that cronyism promotes racism, and that a reasonable fact-finder could conclude that that's true and find in favor of our clients. Thank you very much. That's time, Judge. I didn't hear that. I'm sorry. I'm done, Judge Chueya. Thank you. So that's, I believe, counsel for the opponent, attorney Santu San, you're on. You can mute your audio and proceed with opening statement, for which you have two minutes. Thank you, Your Honor. May it please the court. My name is David Santusanio. I represent the MBTA. The district court correctly granted summary judgment for the MBTA, and we ask this court to affirm. I'd like to focus today on two essential points of the district court's decision. First, Mr. Henderson's failure to produce evidence of pretext in connection with his race discrimination claim. And second, his failure to produce evidence of causation in connection with his retaliation claim. Turning first to the race discrimination and the lack of pretext, it is MBTA's practice to select for hire the candidates who score highest on the interview. And to that end, the TEA sets up a structured interview process where human resources and the department develop job-related interview questions and answers. The same selection committee members ask the same 12 questions in the same order. Those interviews are scored independently, tallied, and the highest-scoring candidates are selected for the job. Here, those highest-scoring candidates were Ms. Higgins and Mr. Melchionda. And this court has long recognized that interview performance is a legitimate basis for hiring decision. And here, Mr. Henderson cannot show pretext. Mr. Melchionda met the requirements for an interview, and he met the requirements for the job. Turning to the retaliation claim, the timing on that claim is fatal. The alleged protected activity, the complaint to Satyen Patel, occurred five months after the adverse employment action. Further, there is no evidence in the record that the alleged decision-maker even knew about the alleged protected conduct. And for that reason, both claims, both the race discrimination claim and the retaliation claim, the dismissal of those claims should be affirmed. Thank you. I'm only going to ask you one question, and that deals with two of the cases that you claim are applicable, and which apparently your opponent does not feel are applicable, and I'm talking about Martinez-Burgos and the Plymouth County Sheriff's case. Can you comment on that? Yes, Judge Sawyer. Both cases apply here. With respect to the Plymouth County case, that, too, was a case where there was a panel that interviewed candidates. Those questions, like the questions here, talked about work experience, background, and the candidate's interest in the position. And following that interview, five candidates were asked to take an exam, and ultimately the candidate who was not selected, the plaintiff in that case, the court identified the fact that she had scores that were much lower than the successful candidates. And on that basis, in that case, the court found that both the plaintiff was not only not qualified, but not surprisingly not similarly qualified. And likewise, with respect to the Martinez-Burgos case, in that case, the record suggests that interview scores were the only determining factor to support the hiring decision. And similarly, that case had a panel ask the same questions, job-related questions, just like here. And in that case, the five highest-scoring interviews were considered, and the others were not. And likewise, the court found that the plaintiff in that case was not qualified and not similarly qualified. So yes, Your Honor, we believe those cases support the finding that the plaintiff failed to make out a prima facie case. What about the fact that the plaintiff in this case had been a supervisor of prior cases? That was certainly relevant work history that made him qualified for the job. And I say qualified for the job in terms of the second prong of the prima facie case. So yes, he was qualified for the job, and that was a relevant consideration for him getting an interview. But after the interviews happened, it's the interview scores that control. And as we've seen, as the record demonstrates, he performed poorly on those interviews, and ultimately the interviews were the deciding factor and the controlling factor. What does the record show as to his performance as a supervisor? There is very little in the record, frankly, about his performance. And I think, Your Honor, that's ultimately not relevant to the T's decision about who to select for this position. Because, as I say, once the interviews occur, it's the interview score that controls. And there isn't a process of comparing the relative qualifications of the various candidates. But wouldn't it be a valid argument to say that you're interviewing him for his qualifications as a supervisor, not for how well he interviews? I understand, Your Honor, and that really goes to a question about this process and, frankly, the MBTA's business judgment in selecting candidates in this way. There is more than one way to select candidates, but this is the way that the MBTA selects its candidates, and that's the business judgment. Time is up. Thank you, Your Honor. Judge Lynch? Yes. Counsel, as I understood the record, the white male who was hired actually had a lot of construction supervision experience in his career. It simply wasn't at the MBTA. Is that correct? That is correct, Your Honor. Okay. Moving on. As I understood the computer issue, the training which Mr. Henderson had and the certificates he got were on word processing programs. As I understood it, the winning candidate was not so limited in his computer usage. He actually used other programs, some of which were listed in the job posting. Is that correct? That is also correct, Your Honor. Okay. So his case seems to be coming down to, well, why did the committee rate his computer skills more highly than Mr. Henderson's skills? The district court was skeptical, as Judge Barron has pointed out, but give me a non-discriminatory reason for that. The follow-up point, of course, is that computer skills were just one of a number of things being evaluated, and the committee could well have decided that the other skills not being attacked in this case outweighed the computer skills. But let's go back to the computer skills. Why did the committee give him the rating it did? Yes, Your Honor. On that point, question four of the interview asked about computer skills and using various systems. Mr. Melchionda talked about his operational experience working with computers, including creating logs, printing out purchase orders, requesting forms, maintenance logs, and explaining how he used computers in the past in his jobs. He also said that he uses a computer at his home every day. Mr. Henderson, despite what certificates he may have had and background he had, he spoke about some of his background, but there's no suggestion that in that interview that he necessarily had certain qualifications or training. He spoke about his interests. Ultimately, we're talking about two people explaining their experience, and in the selection committee's view, apparently Mr. Melchionda did that better. Counsel, as I recall the record, two people in fact got promoted. The other was a white woman from within the team. Is that correct? That's also correct. Ms. Higgins? That seems to have dropped out of the case in terms of a challenge from the plaintiff, but it seems to me it's certainly relevant to the claims here of differential treatment. I don't quite understand, and never did, why the district court referred to cronyism. The white woman selected came from within the team. The white man selected came from outside the team. Was there any evidence put on by the plaintiff that he somehow was a crony of someone making the decision? There was no evidence of that, Your Honor, and we were surprised and disappointed to see that reference because that was not part of the case and there was no evidence to that effect. The closest that the plaintiff could come is to say that Mr. Melchionda had mentioned in his references someone he knew at the T, Bill Perez, but there was no evidence that Mr. Perez involved himself in any way. The members of the selection committee both said that they had not had any contact with Mr. Perez, and so there was no evidence of it, and it should not, frankly, have been mentioned. Okay. I have no other questions. Thank you, Your Honor. Judge Barron? You have four minutes. Sure. Thank you. Thanks. I just want to focus in on the scoring. So I take it you're not challenging the idea that if there was reason to doubt the legitimacy of the scores, that would supply a basis for concluding that there was pretext, or are you challenging that? Our position is there was no reason to challenge the scores. That's not my – I know that's not my question, though. Oh, I'm sorry. I misunderstood. If there were reason to question the legitimacy of the scoring, would that suffice to show pretext? Not alone, Your Honor, because what is missing, in our view, is any suggestion that a problem with the scoring was in any way connected with race. Well, that I don't quite understand. How is the McDonnell-Douglas framework supposed to work? We only do it when there's no direct evidence of discrimination. So I had thought if the employer dealing with similarly qualified people, one black, one white, chooses the white person and is shown to have given a legitimate nondiscriminatory reason, that could not have been the reason, that that could be enough to show race discrimination. Are you saying that's not right? Well, that might be – I mean, depending on the evidence, there could be a showing of pretext, but let's keep in mind, too, that there needs to be a showing that the decision was motivated by discriminatory animus. Yeah, but the way we get at that in the absence of direct evidence of discrimination was through the burden-shifting framework. Here, if you have a candidate who's qualified similarly to a white candidate, and the only reason the employer is given for not hiring the black candidate and hiring the white one is a reason that is shown to be pretextual, why could not a jury infer that the reason had to do with race? I don't think it would be required to, but there is that required showing of discriminatory animus. But here, we don't have it. The only evidence of pretext is some question about why one of 12 interview scores – That's actually not the way I read the district court. She says, in her opinion, that with respect to the objective questions, she says some of the questions the committee asked in the interview involved objective criteria. And she says, for example, please tell us about your experience managing large maintenance or construction projects. And here, Melcondia got an 8, Henderson got a 4, and she says that made sense because Henderson provided fewer specifics after she reviewed the notes. But then the district court goes on and says, for another question dealing with computer experience, the committee's notes reflect that Henderson had more experience than Melcondia, yet Henderson received three points lower. And then, she says, this is still talking about objective criteria questions. It's still talking about other questions. She says, many questions involve open-ended inquiries requiring the committee to subjectively evaluate the candidate's answers. For example, the first question asks, why did you apply for this position? And then she says, a review of the answers to this question does not reveal an objective basis for why Melcondia got an 8 and Henderson a 5. And so what I take her to be saying is, well, in some of the objective criteria, one cannot explain the much higher score for Melcondia compared to Henderson. And in consequence of that, there's reason to doubt that the subjective scoring that occurred was on the up-and-up. And I don't see why a jury couldn't infer exactly that. They wouldn't be required to do it. But on summary judgment, why couldn't the fact that there's an inexplicable higher scoring on an objective criteria cast doubt on how legitimate the subjective scoring was? Well, for one thing, Your Honor, the First Circuit has never drawn this sort of objective-subjective inquiry. No, no, that's true in the abstract. But if you have evidence that some of the objective scoring does not make sense, why couldn't you infer that that would cast doubt on the legitimacy of the subjective scoring? If the objective scoring was legitimate, I could see why you wouldn't then second-guess the subjective scores. But if the objective scoring is illegitimate, wouldn't that cast doubt on whether you should trust the subjective scoring? Why wouldn't that be the case? I don't think that we have that situation here, Your Honor. Is that dependent on me rejecting the district court's conclusion that the objective scoring of the computer question is inexplicable? I don't think it depends on that at all, Your Honor. I think we're obviously looking at this de novo. The court is looking at this de novo. It can review the answers and the notes and also recognize, as it is said in the past, that it is not a super-personnel department. Just on this one last question, if I agree with the district court that the scoring of the objective question about computers is inexplicable, given the notes, why couldn't that be a basis for a jury to infer that it should distrust the subjective scoring as well? Because at this point you're just asking the jury to speculate and guess. Without more evidence that race was somehow at play here and without evidence that the questions were discriminatory, that is not enough in our view. What would be your best precedent to support the view that when there is reason on the record to doubt objective scoring, that cannot alone suffice to show pretext? I would point this court to the four First Circuit interviews. But none of those cases involved evidence that would cast doubt on the legitimacy of the objective scoring? So do you have any case in which there has been evidence that casts doubt on an objective score and yet the court has concluded that's not enough to show pretext? No, not that I'm aware of, Your Honor. Not in the First Circuit. Okay. Thank you. I believe this is the time to hear a reply from the appellate. Thank you, Your Honor. We seem to be spending... I think you have four minutes. Am I correct? Yes. Okay. I'm sorry. Do I have time? Judge, this is Dan Toomey. He did not reserve time. If you want to grant time, I can keep the clock for you. Oh, he did not reserve the time? No, Judge. All right. Then I think that's the end of the hearing. Thank you, Judge. Thank you, counsel. Thank you, Your Honor. Excellent argument. Thank you, Your Honor. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.